No. 04-99-00872-CV



Jeannie MARTINEZ, et al.,


Appellants


v.


City of SAN ANTONIO, et al.,

Appellees



No. 04-99-00873-CV


William HERNANDEZ, et al.,

Appellants


v.


VIA METROPOLITAN TRANSIT, et al.,

Appellees



No. 04-99-00874-CV


Eric T. FERGUSON, et al.,

Appellants


v.



ALAMO IRON WORKS, INC., et al.,

Appellees


From the 131st Judicial District Court, Bexar County, Texas

Trial Court Nos. 94-CI-13683, 94-CI-05650, 94-CI-06521

Honorable David Peeples, Judge Presiding


Opinion by: Paul W. Green, Justice


Sitting: Phil Hardberger, Chief Justice

 Paul W. Green, Justice

 Karen Angelini, Justice


Delivered and Filed: January 31, 2001


AFFIRMED


 Approximately six-hundred San Antonio residents claim to have been injured as a
result of exposure to lead contaminated soils excavated from the site of a former iron foundry
during construction of the Alamodome Sports Complex. In three separate lawsuits, which
were later consolidated for discovery purposes, the residents named numerous defendants,
including the City of San Antonio, VIA Metropolitan Transit ("VIA")(developer of the
Alamodome project), and Alamo Iron Works (prior owner of the iron foundry). The
defendants filed traditional and "no evidence" motions for summary judgment claiming,
among other things, there was no causation evidence demonstrating the injuries claimed by
the plaintiffs were caused by the Alamodome excavation activities. After striking the
testimony of the plaintiffs' causation experts, the trial court granted summary judgment to
all defendants on "no evidence" grounds and to VIA on sovereign immunity grounds.

 The plaintiff-appellants complain the "no evidence" motions for summary judgment
were considered prematurely, but that in any event, sufficient evidence was presented to
defeat the motions. With regard to the latter assertion, the issue centers on whether the trial
court abused its discretion in striking the expert causation evidence when the testimony failed
to exclude other sources of lead contamination. We hold the trial court did not abuse its
discretion in striking the causation experts and affirm the no-evidence summary judgments.
We do not reach the plaintiff-appellants' remaining point of error. 

BACKGROUND


 Construction of the Alamodome began in 1990 at a location on the near east side of
San Antonio. Before being selected as the site for construction, the location served many
industrial businesses, including machine shops, an oil house, a lime house, a tin shop,
blacksmith shops, paint storage facilities, and Alamo Iron Works, which operated a ferrous
and non-ferrous foundry from 1884 until its closure in 1989. The area surrounding the
Alamodome site is mostly a commercial and industrial area, housing a foundry, a furniture
factory, a roofing and metal company, and several machine shops.

 Appellants live in the neighborhood surrounding the Alamodome. They claim that
between October 1990 and September 1993 construction activities at the Alamodome site
caused "fugitive dust" containing lead to migrate into and contaminate the surrounding
neighborhood. Appellants claim Alamodome construction activities, including hauling
contaminated soil from the site, disseminated lead-laden dust throughout the neighborhood,
causing property damage and personal injury. Appellants brought suit under the theories of
negligence and gross negligence, public and private nuisance, nuisance and negligence per
se, trespass, maintenance of an ultra-hazardous activity, and unconstitutional taking of
property.

 To determine the amount of lead disseminated during construction activities,
appellants hired Dr. Jack V. Matson and Dr. Colin J. Baynes. Matson, taking into
consideration the various Alamodome construction activities, calculated the amount of
fugitive dust emitted during the phases of construction. Next, Matson estimated the amount
of lead present in the dust. Baynes took Matson's dust and lead calculations and determined
the amount disseminated and the destination of the dust, incorporating the weather conditions
during the periods of construction.

 In August 1996, the trial court entered a discovery order, selecting fifty plaintiffs for
full discovery, including expert reports. In 1998, more than four years after appellants
initially filed suit, appellees filed no-evidence motions for summary judgment arguing,
among other things, appellants had no evidence of causation. After appellants filed their
response, appellees amended their motions for summary judgment and, concurrently, filed
a motion to strike the testimony of Matson and Baynes, challenging the reliability of their
opinions. In July 1999, the trial court held a Robinson hearing and struck the expert
testimony. The trial court granted the no-evidence motions, as well as a traditional summary
judgment motion in favor of VIA on the ground of sovereign immunity.

DISCUSSION

 Appellants complain the trial court abused its discretion in striking the testimony of
Matson and Baynes. Appellants also challenge the no-evidence summary judgment, arguing
it was premature and improper because legally sufficient evidence was presented.

The No-Evidence Summary Judgment


 The trial court granted the no-evidence summary judgment in favor of appellees
before the end of the discovery period. Appellants challenge this judgment on the grounds
that it was prematurely considered and that there was sufficient evidence to withstand the
motion.

Premature Consideration of


No-Evidence Motion for Summary Judgment


 Appellants argue they were not provided "adequate time for discovery" before the trial
court's entry of summary judgment. In support of their argument, appellants rely heavily on
the Notes & Comments of Rule 166a(i), which provide "[a] discovery period set by pretrial
order should be adequate opportunity for discovery unless there is a showing to the contrary,
and ordinarily a motion under paragraph (i) would be permitted after the period but not
before." Tex. R. Civ. P. 166a(i), cmt. Appellants also contend the trial court's entry of a
Lone Pine order (1) hindered their ability to conduct the discovery necessary to overcome the
no-evidence motion.

 No Texas appellate court has overturned a no-evidence summary judgment on the
ground that adequate time for discovery had not passed. See, e.g., Specialty Retailers, Inc.
v. Fuqua, 29 S.W.3d 140, 146 (Tex. App. - Houston [14th Dist.] 2000, pet. filed) (finding
sixteen months adequate time for discovery prior to a no-evidence motion); Dickson Constr.,
Inc. v. Fidelity & Deposit Co. of Md., 5 S.W.3d 353, 356-57 (Tex. App. - Texarkana 1999,
pet. denied) (finding four years adequate time for discovery prior to a no-evidence motion).
In determining whether adequate time for discovery has passed, we examine: (1) the nature
of the case; (2) the nature of evidence necessary to controvert the no-evidence motion; (3)
the length of time the case was active; (4) the amount of time the no-evidence motion had
been on file; (5) whether the movant had requested stricter deadlines for discovery; (6) the
amount of discovery already taken place; and (7) whether the discovery deadlines in place
were specific or vague. Specialty Retailers, 29 S.W.3d at 145; Dickson Constr., 5 S.W.3d
at 356.

 Although judgment was entered prior to the expiration of the discovery period,
appellants had adequate time to conduct discovery during the five years the case was
pending. In addition, appellants are presumed to have duly investigated their case before
filing suit in September 1994. See McAllister v. Samuels, 857 S.W.2d 768, 773 (Tex. App.
- Houston [14th Dist.] 1993, no writ). Further, the agreed order setting the summary judgment
hearings before the end of discovery resulted from appellants' request for a revised case
management order; therefore, appellants made the motion, agreed to the order, and now seek
reversal based on their own procedural vehicles. Although appellants complain the Lone Pine
order prevented them from conducting other discovery, the evidence discoverable by virtue
of the Lone Pine order, i.e., full discovery on fifty minor plaintiffs, includes the kind of
evidence appellants might have used to overcome the no-evidence motion. Accordingly, we
conclude appellants had adequate time for discovery before consideration of the no-evidence
motion for summary judgment.

Sufficiency of Appellants' Evidence


 Appellants also argue the no-evidence summary judgment was improper because they
raised a fact issue as to causation. Specifically, appellants assert they presented evidence
showing that lead originating from the Alamodome site was dispersed throughout the
neighborhood during construction activities. Appellants also claim to have presented
evidence that such lead from the Alamodome site caused their injuries.

 No-evidence motions for summary judgment are governed by Texas Rule of Civil
Procedure 166a(i). To overcome a no-evidence motion, the nonmovant must produce some
evidence raising a genuine issue of material fact as to each element of its cause of action.
Weiss v. Mechanical Associated Servs., 989 S.W.2d 120, 123 (Tex.App. - San Antonio 1999,
pet. denied). A no-evidence summary judgment is improper when the nonmovant
demonstrates more than a scintilla of probative evidence. Benitz v. Gould Group, 27 S.W.3d
109, 113 (Tex. App. - San Antonio 2000, no pet. h.). However, the nonmovant may not rely
on evidence that is inadmissible or amounts to no more than a scintilla. Weiss, 989 S.W.2d
at 124. To determine whether the no-evidence summary judgment was proper, we review
the evidence in the light most favorable to the nonmovant, disregarding all contrary evidence
and inferences. Id. When, as in this case, the judgment omits the grounds for the no-evidence
summary judgment, we will affirm on any meritorious theory advanced in the motion. State
Farm Fire & Cas. Co. v. S. S., 858 S.W.2d 374, 380 (Tex. 1993).

 Causation cannot be established by mere speculation, and to overcome the no-evidence motion, appellants must have presented more than a scintilla of evidence that lead
dispersed during Alamodome site construction activities caused their injuries. See, e.g.,
Union Pump Co. v. Allbritton, 898 S.W.2d 773, 775 (Tex. 1995); Ward v. Northeast Tex.
Farmers Co-op. Elevator, 909 S.W.2d 143, 150 (Tex. App. - Texarkana 1995, writ denied).
To demonstrate causation, appellants presented circumstantial and expert evidence, including
the testimony of Matson and Baynes. After the Robinson hearing, the trial court struck the
testimony of both experts.

 We may not disturb the trial court's exclusion of expert testimony absent an abuse of
discretion. E.I. du Pont de Nemours & Co. v. Robinson, 923 S.W.2d 549, 558 (Tex. 1995).
The test for abuse of discretion is whether the trial court acted arbitrarily, unreasonably, or
without reference to any guiding rules or principles. Id. We cannot find an abuse of
discretion simply because we would have ruled differently in the same circumstances or if
the trial court committed a "mere error in judgment." Id. Admissibility of expert testimony
is governed by the Texas Rules of Evidence and the Robinson factors. Tex. R. Evid. 702,
705(c); Robinson, 923 S.W.2d at 556. Robinson teaches that, in addition to demonstrating
an expert witness is qualified to testify, the proponent must also demonstrate the expert's
testimony is both relevant to the issues and based on a reliable foundation. Robinson, 923
S.W.2d at 556. At the Robinson hearing, appellees did not challenge the experts'
qualifications or the relevance of their opinions, but rather, challenged the reliability of the
expert testimony.

 This court has held that when "an expert's testimony lacks a reliable scientific basis,
its admission by the trial court constitutes an abuse of discretion." Ford Motor Co. v.
Aguiniga, 9 S.W.3d 252, 262 (Tex. App. - San Antonio 1999, pet. denied). Further, we have
held an expert's failure to rule out alternative causes of injury renders the opinion unreliable.
Weiss, 989 S.W.2d at 125 (citing Merrell Dow Pharmaceuticals, Inc. v. Havner, 953 S.W.2d
706, 711-12 (Tex. 1997)). In Havner, the supreme court described how the foundation of an
expert opinion could be unreliable:

If the foundational data underlying opinion testimony are
unreliable, . . . any opinion drawn from that data is likewise
unreliable. Further, an expert's testimony is unreliable even
when the underlying data are sound if the expert draws
conclusions from that data based on flawed methodology. A
flaw in the expert's reasoning from the data may render reliance
on a study unreasonable and render the inferences drawn
therefrom dubious. Under that circumstance, the expert's
scientific testimony is unreliable and, legally, no evidence.


Havner, 953 S.W.2d at 714.

Testimony of Dr. Jack V. Matson


 Matson made two calculations in arriving at his conclusion. First, utilizing the
Environmental Protection Agency's AP-42 test, he determined the rate of fugitive dust
emissions during Alamodome construction activities. Second, he calculated the amount of
lead present in the emitted dust. Although Matson did rely upon the accepted AP-42 test to
arrive at a conclusion regarding the amount of dust emissions, he employed his own
independent methodology to calculate the amount of lead present in the dust emissions.

 Matson's second calculation regarding the amount of lead took two steps to derive.
First, he examined the results of soil sample testing conducted at the Alamodome site to
determine the fraction of the lead present in the Alamodome soil. He then concluded that,
due to the size and weight of the soil samples, the amount of lead which became airborne in
the dust would not be accurately reflected in the soil sample results, i.e., that smaller
particles (those with less mass) would be more likely blown into the air because of their
lighter weight. Accordingly, Matson applied an "enrichment factor" to the results, calculating
there was 3.3 times more lead in the airborne dust disseminated throughout the neighborhood
than in the soil sampled by the testing engineers.

 To support Matson's use of the "enrichment factor," appellants point to the "Socorro
Report," a study regarding lead contamination resulting from a New Mexico smelting
facility. Appellees presented evidence to the trial court attacking appellants' reliance on the
Socorro Report. Specifically, appellees point out that no demonstration was made that: (1)
a lead smelter is comparable to the iron foundry in question; (2) New Mexico desert soils are
comparable to San Antonio soils in terms of cohesiveness, moisture retention, and clay
content; (3) lead in San Antonio soils is distributed into the fine portion of the soils at a 3.3
or any other ratio; (4) the meteorology (especially rainfall) in New Mexico is comparable to
San Antonio; and (5) results from measuring 100 year old lead deposits from a lead smelter
on soil in New Mexico is relevant to lead in soil at an iron foundry in San Antonio, Texas
in 1991-93. Further, we also recognize Matson determined the "enrichment factor" first and
then located the Socorro Report to support his conclusion. Considering the evidence
presented to the trial court, we cannot conclude the trial court abused its discretion in striking
Matson's testimony.

Testimony of Dr. Colin J. Baynes


 The reliability of Baynes's opinion hinges on the reliability of Matson's calculations.
In arriving at his conclusion, Baynes used the Industrial Source Complex Model ("ISCM")
developed for the Environmental Protection Agency. He then input Matson's calculations
to arrive at a conclusion regarding the amount of lead emitted throughout the construction
activities. Although Baynes's methodology, the ISCM, may be accepted and reliable, the use
of Matson's unreliable calculations within the equation renders his opinion unreliable. As
such, we cannot conclude the trial court abused its discretion in striking Baynes's testimony.

Other Evidence of Injury Causation


 Notwithstanding the exclusion of the experts' testimony, appellants claim they
presented evidence that lead in their houses originated from the Alamodome site. They
presented soil samples demonstrating the soil at the Alamodome site contained lead, along
with evidence that dust in appellants' homes contained lead. They also presented evidence
of the various construction activities taking place, including the trucking of the contaminated
soil throughout the neighborhood. Moreover, medical tests confirmed the neighborhood
children had higher than average levels of lead in their blood. Finally, appellants introduced
the expert testimony of Dr. James Millette who, after performing gas chromotography,
concluded that lead in the dust in appellants' houses probably originated from the
Alamodome site.

 In Weiss, the plaintiff brought suit against a radiology group operating in a
neighboring office, claiming injury from exposure to chemicals that migrated from the
radiology office into hers. Weiss, 989 S.W.2d at 122-23. The plaintiff's expert concluded the
chemical exposure could be inferred from the plaintiff's manifestation of physical symptoms.
Id. at 123. The expert noted the plaintiff's symptoms were similar to those caused by
exposure to the chemical in question. Id. However, he could not rule out the possibility that
mold or other fungi detected in the environmental study could have caused the illness, and
he acknowledged the plaintiff exhibited some of her symptoms prior to working in the
building. Id.

 After assuming the admissibility of the expert testimony, we reviewed it, along with
the plaintiff's circumstantial evidence of causation, to determine if the plaintiff raised an
issue of fact:

In Havner, the court found no evidence of causation, despite
evidence of exposure, because Havner failed to introduce
evidence excluding other plausible causes with reasonable
certainty. In particular, the court observed the expert opinion
was unsupported by the epidemiological studies cited within and
was based on unreliable medical opinions.


Id. (citations omitted).

 Following Havner, we concluded the expert testimony amounted to "no evidence" of
causation, and although the plaintiff presented circumstantial evidence of exposure, her
experts were not permitted to stack their inferences upon the circumstantial evidence without
a reliable foundation. Id. Accordingly, we affirmed the no-evidence summary judgment
because the plaintiff presented no evidence of causation. Id.

 In the present case, appellants claim they presented some evidence of injury causation
by demonstrating: (1) they suffered injuries consistent with lead poisoning; (2) lead
poisoning causes injuries; and (3) expert testimony that the quantity of lead dissemination
leads to injuries. Appellants introduced general testimony from two medical experts, Drs.
Joel Pounds and Wayne Snodgrass, regarding the injuries that can result from lead exposure,
including the injuries resulting low-level exposure like that claimed by appellants. Further,
appellants introduced the expert testimony of Dr. Alan R. Hirsch, who examined the forty-nine minor appellants selected by the Lone Pine order. Of those children, seventy-six percent
displayed lead-induced neurological dysfunction.

 Although Dr. Hirsch's report demonstrates the examined appellants were exposed to
lead, it could not determine the source of the lead. Further, the testimony of Drs. Pounds and
Snodgrass that exposure to lead is serious does not demonstrate the children examined have
lead poisoning. Rather, the doctors merely showed the children are at risk for lead poisoning,
which is insufficient to raise a genuine issue of material fact: "To raise a fact issue on
causation and thus to survive legal sufficiency review, a claimant must do more than . . .
show a substantially elevated risk . . . . Further, if there are other plausible causes of the
injury or condition that could be negated, the plaintiff must offer evidence excluding those
causes within reasonable certainty." Havner, 953 S.W.2d at 720 (citations omitted).
Although causation may be proved by expert testimony, the probability about which the
expert testifies must be more than coincidence for the case to reach a jury. Weiss, 989
S.W.2d at 125 (citing Schaefer v. Tex. Employers' Ins. Ass'n, 612 S.W.2d 199, 202 (Tex.
1980)).

 Appellants also point to the evidence they claim was improperly excluded by the trial
court, i.e., the expert opinions of Matson and Baynes. Specifically, appellants claim the
testimony of Matson and Baynes demonstrates the construction activities taking place on the
Alamodome site caused emission of toxic quantities of lead throughout the neighborhood.
Matson's opinion constitutes no evidence because he failed to address the lead emission rates
of sources other than the Alamodome's construction activities:


 Is [the Alamodome site] the only potential source of
contamination or air pollution that you examined?



 Yes.



 You did not look at any other possible contributing
sources to any lead in the atmosphere in San Antonio; is
that correct?



 That's correct. I was not concerned with the lead in the
atmosphere from any other site other than the
Alamodome.



The opinions of Matson and Baynes, when offered to prove Alamodome site lead caused
appellants' injuries, constitute no evidence because Matson, in arriving at his lead
calculation, failed to rule out alternative sources of the lead contamination. Id.; Mitchell
Energy Corp. v. Bartlett, 958 S.W.2d 430, 447-48 (Tex.App. - Fort Worth 1997, pet.
denied). We thus conclude appellants have presented no evidence demonstrating that
Alamodome site lead disseminated through construction activities caused their injuries.

CONCLUSION

 We hold the trial court did not abuse its discretion in striking appellants' causation
experts. We affirm the trial court's no-evidence summary judgment in favor of all appellees,
and accordingly, we do not reach appellants' remaining point of error.



 PAUL W. GREEN

 JUSTICE


PUBLISH
1. The term, Lone Pine order, originates from a New Jersey case where the trial court entered an order
"designed to handle the complex issues and potential burdens on defendants and the court in mass tort litigation."
Acuna v. Brown & Root, Inc., 200 F.3d 335, 340 (5th Cir. 2000) (citing Lore v. Lone Pine Corp., No. L-33606-85
(N.J. Super. Ct. 1986)). In this case, the Lone Pine order was entered on August 15, 1996, selecting fifty personal
injury plaintiffs for full discovery and requiring appellants to prepare expert reports for such plaintiffs within
ninety days.